Thank you, Your Honor. Good morning, and may it please the Court. My name is Jeanne Sternberg, appearing on behalf of the appellant Tyquan Cox. I would like to reserve five minutes for rebuttal. I'm going to focus my remarks today on counsel's deficient representation during the penalty phase and hope to have some time to discuss the shackling of Mr. Cox. As part of the penalty phase I plan to cover counsel's failure to ever understand that Mr. Cox had a meritorious legal defense to the intent requirement of the special circumstance, one that was strongly endorsed by the California Supreme Court in the co-defendant's case. And also to touch a little bit in the penalty phase on counsel's very tardy realization that Mr. Cox was the aider and abetter, because these errors of law and fact impacted counsel's penalty phase investigation and presentation of this theme. Counsel never explained the real significance of the fact that Mr. Cox was the aider and abetter on his culpability. With respect to the penalty phase, Mr. Cox's case does look a little different than others that have come before the court. You know, the penalty phase, the evidence is pretty overwhelming, so you might be better off just talking about the... I don't mean the penalty phase. I'm talking about the guilt phase. Yes, Your Honor. Yes, Your Honor, I am. But the aiding and abetting issue was a centerpiece of counsel's penalty phase. It is true that counsel did some investigation into penalty phase issues. They interviewed witnesses, and they obtained records. It is also true that counsel put on some witnesses. Counsel also retained experts in this case, and two of the experts, the psychologist Michael Maloney and the gang expert Fred Williams, figure prominently in counsel's deficiencies. So given what counsel did, the natural and critical questions that are before the court are, first, are these differences from other cases constitutionally significant on the questions of counsel's deficient performance and prejudice? Second, was counsel's limited investigation reasonable? And third, did counsel's investigation enable them to make informed decisions, both on how best to represent their client and how to advise their client? Counsel, in analyzing these issues, is this an EDPA case or a pre-EDPA case? This is a pre-EDPA case, Your Honor. It seems that both sides and the district court judge all agreed it was a pre-EDPA case. Yes, they did. On this issue, it was. Is that because the 30-minute complaint related back to the first one? There were several. There were two pre-EDPA petitions filed, one in 1992 and one in January of 1996. And this issue, all of the certified issues, actually, were fully presented in the very first petition, and the other petitions added, really, almost nothing. Different phrasing, different words. There were no facts that were added. Does that apply to the Shacklin claim as well? Yes, it does. And did the Shacklin claim and the pre-EDPA petitions involve a claim of prejudice at the penalty phase as well as at the guilt phase? Yes, it did. The one thing that's clear about the Shacklin claim is that petitioner has consistently argued that the Shacklin that occurred at the guilt phase was prejudicial, both as to guilt and penalty, and the district court found that we goofed and didn't squarely and clearly raise the fact that he was also shackled at the penalty phase. And we have addressed that in our brief and suggested that we should be allowed to go forward. Are you arguing that he was shackled at the penalty phase or that the guilt phase Shacklin affected the jury at the penalty phase? Both. The undisputed evidence shows with respect to the penalty is that, as in Wiggins, the scope of counsel's investigation was unreasonable in light of what they had actually found and discovered in the school records, in the CYA records. Let me ask you, what do you have that you can direct this to, that he was shackled during the penalty phase? I believe that the California Supreme Court decision made a finding that he was shackled throughout the trial. We also have a declaration from his sister, Mr. Cox's sister, Adrena Myers, who said that he was wrist cuffed to the chair. He had a handcuff to the chair on the day she testified, and she testified only in the penalty phase of trial. But the crucial question here is the jury's knowledge of that fact. And I may be mistaken on this, but my reading of it was that the only factual finding is that four jurors observed Shacklin during the guilt phase, and that there's no finding of any juror so observing during the penalty phase. Am I reading that incorrectly? I believe you are, Your Honor. I believe the declarations don't just say during the trial, throughout the trial. Where did the district court testify? The district court, I believe, held, first of all, that we could not argue that he was shackled at the penalty phase because the district court believed it wasn't squarely presented. And also, I believe that there was no finding on the sister's declaration. Well, she wasn't a juror. The question is, what did the jurors see? The jurors saw Mr. Cox shackled during the trial. There is a guilt phase. I'm just your argument, or at least that's what I read. Well, that was the argument as it was limited by the district court. Okay. But what do we do with the California Supreme Court finding that no juror ever saw any shackling? That finding was made only on the direct appeal record. That finding was not made with juror declarations and juror interviews. So in post-conviction in state court, when all of the juror declarations were put in front of the court, the court simply denied the claim on its merits. Was that on a harmless error ground? No. It was a summary minute order denial in post-conviction in state court. And the state court findings on the shackling issue are quite clear, that the trial court didn't base its findings on any determination of the fact that it was based solely on rumor and innuendo, that it was insufficient rumor and innuendo no matter who supplied it, whether it was even supplied by the defendant's attorney. What the court did say is that the record was rife with an undercurrent of tension and emotion, but it didn't contain a single substantiation of violence or the threat of violence. And those findings were not rebutted at all in any of the federal court proceedings. There was no attempt by the state to rebut those findings, and so those went forward presumed correct. In addition to the fact that several jurors saw the shackles in the courtroom... Is there a dispute as to whether he was shackled during the guilt phase? No, there is no dispute about that. You had the same jury. Yes, and he had the same jury, and they had no reason to believe that he was suddenly unshackled. There's just no reason to think that what they had seen every single day during the guilt phase didn't change. And that's confirmed by the sister's testimony. Well, she didn't declare with respect to what jurors could see. And the witness and the jurors are in different places. Yes, that is true. But the jurors were very clear that they saw the shackles throughout the trial. The limitation about seeing them only during the guilt phase is not in their declaration. Even in the Supreme Court's most recent iteration on shackling in the death case, the fact of shackling alone does not equate to reversal. There's still a harmless error analysis that's required. And I would appreciate your addressing why this fact would not have been harmless beyond a reasonable doubt. Yes, Your Honor. One of the harmless error factors we just covered, which is that the jurors actually see the shackles. The second one is that the court looks at whether the shackles are physically painful. And that is right in the trial record itself, that there are three separate complaints about the painfulness and the distracting nature of the shackles. How does that have to do with whether the jurors would have voted differently? Okay, well, let me address that aspect of the prejudice. The shackles clearly painted Mr. Cox as dangerous, as likely to have been violent, as likely to have been the trigger person, which was clearly an issue that they were facing. Yes, but the evidence on those points was overwhelming. I mean, that's even an understatement. It's hard for me to understand how any jury could have come to any other conclusion, regardless of the shackling. Yes. I know I'm speaking for myself. But obviously, I mean, I need to understand from you why you think a jury, given the evidence that was actually presented at both parts of the trial, why a juror might have come to a different conclusion. Yes, Your Honor. I know that the evidence now, from this perspective, looks like it's overwhelming. But if you look at what the jury did in the penalty phase, once they were presented with the aiding and abetting argument, they were out for ten hours over three days. So, however it looks to us now, it looked different to them at the time. It might just mean they were being awfully careful, because this was a hugely important decision. It doesn't mean that it was not an obvious decision, does it? Well, I think it means a little more than that, Your Honor, because in addition to the ten hours of deliberations, the jury came back and they wanted to hear the testimony of Neal Alexander and Ivan Scott, and I want to talk about them in a minute, the two eyewitnesses who were in the house. And then they also asked to rehear the testimony of LaShawn Driver and Venus Webb, who were outside. They also asked for photographs of Mr. Cox and Mr. Williams, who couldn't look more different. And then they also asked for a diagram of the house. The evidence that pointed to the fact that Mr. Cox is an aider and abetter is not a tiny piece of evidence. It is a description by the only two true eyewitnesses to the crime that the person who was the shooter, on whose back Neal Alexander jumped, had a description both by physical appearance and by clothing that matched the co-defendant, Williams. But didn't the jury reject that argument? Not really, Your Honor. Yes, they returned a death verdict, but part of that is owing to how poor the mitigation presentation was. The jurors could have accepted the fact in this case that Mr. Cox was the aider and abetter, but that it was simply not enough, given what else they had to look at at the penalty phase, to give him a life verdict. The other thing I need to point out about the way this case was presented in terms of Mr. Cox being the aider and abetter, by saving the aiding and abetting issue for the penalty phase, and by not understanding how the aider and abetter could be guilty of four counts of first-degree murder without intending to kill, the lawyers moved the defense that should have been presented in the guilt case to the penalty phase. That was part of the strategy of avoiding the death penalty, according to Mr. Cox. And proving intent at the guilt phase, which this is not a certified issue, but proving intent at the guilt phase could be proven by the circumstantial evidence of him walking into the house with his rifle and coming back out and stating what he said afterwards. I mean, people could infer from that. Rational jury could infer from that that he had the intent. Yes, and I actually want to turn a little bit more to the penalty phase prejudice, but let me respond to that. When the California Supreme Court decided the Williams case, the co-defendant's case, one of the comments that the court made was that you could not infer from the crime itself the intent of the person who would be the aider and abetter. And they said there was nothing in the crime itself that suggested anything about the aider and abetter's intent. And the other issue is that the fact that Mr. Cox came out with the rifle is totally consistent with co-defendant Williams having been the actual killer in this case. Can you explain the bullets that they found in three of the four victims or four of the five bullets they found were from the rifle? Yes, every single shot was fired by the rifle that Mr. Williams was holding when Neal Alexander jumped on him in the bedroom and knocked the rifle aside. And then Mr. Williams left and Mr. Cox picked up the rifle and he left. If you'll indulge me for a minute, this is what is a troubling question for me in this case. It is clear that this lawyer did a substantial amount of investigation more than most cases that we have. And it's also clear that he didn't do everything. He didn't have to go through Cox to find out his mother's criminal records or to get the records of the children being taken from the mother or I guess there were a couple other things he didn't do. On the other hand, his position was he had enough, and he did know about abuse by the mother and other abuse issues, that he had enough to make the strategic decision to emphasize the non-shooter theory as the theory of the defense and as a penalty phase, the theory for life. And so in our cases, say, you have to do all the available evidence. Now, how was his strategy decision not to pursue everything to the nth degree, how did that harm? Okay, let me focus. That is kind of a hindsight retrospective view looking back at the way the case looks now and what counsel left himself with when it was time to do the penalty phase presentation. I want to focus on the four clear red flags or pieces of information about Mr. Cox that no reasonably competent counsel trying a capital case in 1985 would have ignored. Let me ask you this. When members of his family, when that testimony took place, the jury learned that he was a Boy Scout, he got some awards, he was a good athlete, he was a good kid, he did other things that were good. But the jury never found out about his life and what he went through with his mother being a prostitute, with him trying to kill his sister, with his mother coming at him with a knife, with this pimp that she was with. He was, as I recall, was murdered. And how when he went to his grandmother, this is when he was a little kid, his mother started a fire in the house. And it goes on and on and on, the time he spent in juvenile dependency court and all those records. And there's a whole, you can go on for a half hour talking about the horrible conditions that this young man was raised under and never really saw his father, I don't mean thinking who his father was. And his sister was the daughter of the pimp and his mother. And none of that, he didn't go. Did he go in there and get these juvenile dependency records? Did he get the other records on the mother, all of her convictions? No, he did not. And he knew about those early. Why don't you talk about that? I just would like to answer my question, which is slightly different. My question is not, should all of that come in? Yes. My question is, should he have gotten all of that information and then made a strategic decision to go with a non-shooter? And not for him, because there is an argument to be made that after the mother was gone, he started living with his grandmother. He did have potential at school. He had educators who liked him. He was a good, he had a possibility of athletics, right? So, if he made that, I mean, the question is, did he have to have all that information before he made this choice? Well, he had to do some basics. And let me do this. Let me talk for a couple of minutes about the three really, really critical red flag indicators, and then move to why I think this information was incredibly valuable and one juror clearly would have voted for life. Because the mitigating evidence that would have been developed from this initial set of records that counsel had really breaks down into about five independent mitigation things. Counsel started okay. He got releases from the client. He talked to the client. He talked to the uncle. He obtained the CYA, the California Youth Authority, and the school records very early on in his representation. The school records say that the client was in foster care. The CYA records say that Mr. Cox was removed from his mother's care at age five, and she was a child abuser. Why would a reasonably competent counsel in a capital case not want to find out why his client was in foster care? What the extent of the abuse was during the most formative developmental years? As counsel's investigation went on, they learned from other family sources that Mr. Cox was removed from the home. And if they had obtained the records, and they actually learned that he was removed from the home twice, if they had obtained the records, they would have learned that Mr. Cox was known to the Department of Social Services. The family was known since 1965. That his mother was his caretaker for approximately the first six years of his life. That she was explosively and uncontrollably violent. She had a history of physical illness and mental instability. And it goes on and on and on and on with incident after incident. You know, what you're really arguing for is that the strategic choice that counsel made wasn't the right strategic choice. But that seems like second-guessing. Because if all of that had been presented, it seems to be at cross-purposes with the idea that he was a basically decent or salvageable kid who wasn't the shooter because Williams, who was the worst guy, was the shooter. I mean, the jury didn't believe that ultimately, but that was the defense theory. And as you pointed out earlier on, it wasn't a foolish theory at all. In fact, you wished he'd started it sooner. And I don't know how those two are compatible and why it was not a reasonable strategic choice. Let me address the compatibility. Because this is no more a strategic choice than the choice in Wiggins. Counsel had a very rudimentary understanding, developed a theme, went forward, although there were red flags all over that it was contrary. The mitigation properly presented and properly developed would not have painted Mr. Cox as a monster. And that was counsel's position that he came to very late in the game, actually, after he was confronted with the fact that they had evidence of abuse and didn't investigate it. He switched up and said, well, it wouldn't have mattered. It would have made him a monster. But the witnesses that counsel would have uncovered would have included junior high school administrators, CYA counselors, elementary school teachers, friends who were not in a gang, including a friend who was then in the Army, and a friend who would have testified that Mr. Cox lectured him and kept him out of the gang because, as Mr. Cox explained, there was nothing the gang could give this kid that his family had not already given him. That is very powerful mitigation. The school teachers and the administrators who counsel did an interview would have talked about Mr. Cox's essential, not a tough and hardened person, someone who was reachable with intervention. The CYA counselors similarly had very positive views of Mr. Cox. He had stepped in to deflect violence away from the staff, which is something that is very difficult to do if you're a CYA ward. So the fact that counsel may have had that theory doesn't square with what the evidence would have showed. Are you saying that all of this funnels in or factors in to the aiding and abetting issue? Is that your argument? No, that is not my argument, that this is independent mitigating evidence, but that the aiding and abetting, given what the court, I believe, has characterized as an enormous crime, just from the questions, the aiding and abetting was not going to tarry the day in this case. That sounds like hindsight to me. Why not? It seems like the jury, they asked for the testimony, the eyewitness identifications, all the evidence about the inconsistent identifications by the two sets of witnesses did come in. Yes, I understand that, but there were things that needed to be explained. Left unmitigated and unexplained, the fact that Mr. Cox was in a gang, and as counsel argued, that he was dominated, is not mitigating, it is not helpful. But if we look at what Dr. Maloney said, and what he would have told counsel, was that even many capital defendants who have harsh socially and psychologically crippling backgrounds don't have backgrounds that are as extreme as Mr. Cox's. Dr. Maloney believed that the trauma left lifelong scars and warped Mr. Cox's options as a child and as an adolescent, and really explained his gang membership. It is the extraordinary history and trauma and neglect that left Mr. Cox damaged, broken, traumatized by age 12, vulnerable to embracing the trappings of a gang life, and that explained his loyalty and the importance to him of having an alternative family, the gang family, and the pressure that put on him, which in turn explains his involvement in the crime. That even as an aider and abetter, how he could have come to be with Mr. Williams on that day. You're saying then that that effective argument could have been made had counsel gone in and gotten his CYA records, his dependency records, gotten all this information on the mother, and presented to the jury the picture, the life that this kid was subjected to, and that somehow they would then conclude he was not an aider and abetter. No, they would conclude that he should live. Why don't you say that then? I thought I had, Ron. I'm sorry. They would have concluded that he should live, and one juror would have concluded that he should live. If they heard all of that, they'd feel very, very sorry for him, and they might decide that he suffered enough in life that he should live and spend the rest of his life in prison. Yes, I think they would. So, he wouldn't have been painted as a terrible person, and who went in there with a rifle and had some other testimony here about what he said after. That's in the record when a certain woman was killed and all that. So, they would have felt sorry for him. All you need is one juror, and he would have lived. Yes, sir. That's your argument in a nutshell. In a way. What do you mean in a way? I see what I'm asking. Why do you have to make everything so complicated in life? Yes, it is a very straightforward argument that one juror would have believed that this person deserved to have a first chance at life. Okay. And I see that I've actually gone over my time and eaten up my rebuttal.  All right. Thank you. Good morning. Deputy Attorney General Jaime Fuster for respondent. Judge Marshall correctly decided in this case that a petitioner is not in death row because of any ineffective assistance of counsel, the use of restraints, or any other error. A petitioner is, well, given the death penalty because of the overwhelming evidence of guilt and the despicable and cold-blooded nature of the crimes he committed. As to a petitioner's claims of ineffective assistance, the pertinent inquiry is not what counsel could have done in hindsight or within decades to investigate the case again, but whether the choices they made at the time were reasonable based on what was known at the time the choices were made. In the first choice, I would like to discuss counsel's decision to emphasize or raise the possibility that the petitioner was not the shooter in the case. Let me ask you a question. When he made the decision, the attorney at the penalty place, did he have all this information about the mother and the dependency records and the CYA records and all the rest of this long, trying history that this kid went through? Did he know that? Did he have it? I asked you, did he have it? He did not have everything that has been presented by habeas counsel in the habeas proceedings. Nevertheless, did he have the mother's records? The criminal records? Yeah. I don't believe so. You don't believe so. All right. Did he have the kid's dependency court records? I don't believe so. Okay. And did he have the CYA records? Yes, he did. And he also had the school records. What? He had the school records and the CYA records, both of them. They also, before they made the strategic decisions for the penalty case, they interviewed the petitioner more than ten times. You know, it's always easy to say strategic decisions. You know, you're in the middle of a trial. I don't know. I mean, people make strategic decisions. That's something the Supreme Court cooked up. And, you know, you get the criminal trial and, you know, all the things that go on. Maybe you make a decision or you don't. You're tired. You don't look at something or you just don't care. And so we didn't say it's strategic. But he made a decision. Well, I think the problem in any kind of our case at this point, years after the case is that we are always looking in hindsight what counsel did and what counsel supposedly should have done. Well, that's true. But we look at hindsight in a lot of these cases and we find people are not even guilty. Well, in this case, there is no doubt that. Well, I'm not saying in this case. But, you know, don't condemn hindsight. Sometimes wisdom comes with hindsight, too. Well, I think in this case the important question is that when counsel decided to rely on 30 years, was it? Well, the case was tried in January of 1986. So it has been. 19 when? 1986. So it has been 23 years since the trial. But the point I wanted to raise is that at the time counsel decided to rely on the non-shutter theory as opposed to some evidence of abuse, they have interviewed petitioner more than 10 times. They have interviewed all of those that were closest to petitioner at the time in 1985 when the case was being investigated. Those who knew him better, including his uncle Barry Armstrong, both of his parents, his siblings, and his grandmother and his great-grandmother. And the important thing here is that the account that was given by all these family members, including petitioner, to counsel was a consistent one, one in which his main caretaker in life was the great-grandmother, not the mother. They also learned that the mother was abusive, that she had a criminal record, that she was an addict. They also knew that she lost custody. So when they found out about that, why didn't that lead one reasonably to go get the mother's criminal record? I think what happened is that because the main consistent account that we're getting is that even if the mother was a horrible person, the great-grandmother was the main caretaker in his life, and she was not abusive. She gave him a stable home. He got to do cops, cops. He got to do sports. He got to go to school. And that testimony or that evidence was going to be there no matter what, even if they could find that early in his life he was abused by his mother, the bottom line in this case from counsel's point of view at the time is that no matter what the mother did to petitioner, he was given a stable home for many years before the crimes by his great-grandmother. All right, assume that that's what the trial counsel decided to emphasize because it lends support to his non-shooter theory. Another area that he didn't look at, which he even noted in his notes that he should have looked at, was to talk to Cheatham, Idemore, and what's the other one? Lisa, Brown, Williams, to find out the circumstance. Everybody apparently was high on crack, especially Williams, and Cheatham might have been able to shed and at least talk to him, find out what the circumstances were, what the plan was. I mean, if Williams was, this is consistent with the non-shooter, if Williams was the mastermind, leader, organizer of this attack, isn't it deficient for the trial counsel not to talk to the very people who could support his theory that would support life instead of death? Well, the theory was that once petitioner and Williams were inside the victim's house, there was a doubt as to who was the shooter. Evidence as to who used crack cocaine hours before the shooting doesn't really respond or add to who was the shooter inside the house because I think the pertinent thing here is how- Well, if Williams was actually really out of it on cocaine, maybe he was the shooter. But I think the way in which his plan was committed is clearly consistent with some kind of random crazy shooting inside the house. Oh, it seems so consistent with some crazy random shooting inside the house. Well, every single- there were no bullets wasted in this case. Didn't they go to the wrong house? How'd they end up at this house? Well, that's because it seems like they have an address on a piece of paper. So clearly this was a premeditated shooting. They were looking for the house based on an address that was written on a piece of paper. Okay, the counsel's theory was Williams was however many years older and Williams was organizing this whole thing. I suppose that he should at least have talked to Cheatham and the others to find out, is this true? Was Williams really doing it? Was he the one who was going to shoot? What was the plan? Was Cox just carrying the gun for him, for him to shoot afterwards? Because there was that inconsistent eyewitness testimony inside the house. There is no evidence whatsoever, even in no caution. Well, I know the point is that he had developed that evidence. That was that deficient. There isn't, you're right. And so how come he had written down, interviewed Stanley Cheatham, and he didn't interview him? Because Stanley Cheatham was not a witness to this crime in this case. He was at the house when they were planning this crime. But there is no evidence, even from Mr. Cheatham's own declaration, that he knew what was going to happen and that he wasn't party to any discussions. Of course he would say that. That would make him an accessory before the fact. But then we would be just, I mean, they have to show both lack of confidence by the counsel and prejudice based on evidence. Because this, to me, this is a very close case, like I said. Cook did a lot of things. He had a lot of people coming in and trying to work with Cox. Cox was somewhat uncooperative. He did get a lot of records. He had this theory that maybe he could pay him as some kind of a decent guy in front of the jury, and the jury would opt for life because maybe he could contribute something, living in the prison, however horrible the conditions were. To me, that sounds like a somewhat reasonable theory, but then why not investigate everything you could to support that theory? I think the problem with that position is that the mere fact that Williams may have been using crack and that he is a violent person, that doesn't really show one way or another who was the shooter. Well, Cox wasn't using it at the time, and Williams was. Because I think that in this case, Well, we all know using crack cocaine makes sense. Well, we don't know that. That would just be a speculation. We don't know that it would. In this case, what we know is a general matter from all the expert stuff that we've read about the use of crack cocaine, that it does have a propensity to make people more violent, right? You know that? That's not the top of the list. I wasn't going to convince anybody in this case because of the hard facts about this case. We're not dealing with a case in which they randomly pick somebody and start shooting inside a house. We have a case where they drove, they looked for the search for the victim's house. Both Williams and Petition went in with weapons, and clearly one very significant piece of evidence here, Williams had his own handgun. If he suddenly decided that he was going to start shooting people because of some, you know, crazy idea, because of his cocaine use, he had his own firearm in his hand. Take the statement that was actually made by either Cox or Williams. Somewhat inconsistent testimony in that. Before they entered the house, they were going to shoot this woman. That was their plan. They were going to shoot this woman. All of a sudden, they leave the house, and it's not just the woman at the kitchen table drinking coffee who they've shot. They've shot up the whole house, including kids in their bed. Doesn't that seem a little unkind? Well, for people like us that are reasonable, law-abiding people, that would be normal, but we're dealing here with two hardcore gang members. Cox, you know, Petitioner, and Williams were Rolling Sixties gang members, and everybody knows who the Rolling Sixties are. They were not reasonable people to start with. I don't know who the Rolling Sixties are. The Rolling Sixties is one of the most violent gangs in South Central Asia, Kyrgyzstan, and they're very violent. They are too today. And they're still going on today. And the Rolling Sixties, we have to look at this case from the perspective of who the offenders are. Is this a normal thing for the Rolling Sixties to go in and shoot kids in their bed? Well, hopefully not. I think in most of these cases, that's not the case. That's why I'm wondering why something else has to be going on here. Well, I think I would like just to kind of highlight the facts that can be denied in this case. First of all, there was a dispute. The other two, the other two that were convicted, not only that family was reversed, right? Williams? Williams. He was reversed based on an instructional error. What? He was reversed based on an instructional error as to his spatial sickness. And the other one was Godlike. Godlike, and he's the one that never went into the house. And how much older than Cox was Williams? I think Williams may have been around his mid-20s, and Cox was 18. So they were maybe around five, seven years difference, something like that. And who was the leader? I think there is no show that Williams was the person that was in charge of this hit, this contract killing. Was it contract killing? It was a contract killing. And I think there was, aside from what was presented in the case, the defense counsel were well aware of all the discovery that was given to them by the police. That showed a lot of evidence as to why this happened. It's just that it wasn't presented at the case. For whatever reason, the prosecutor decided this wasn't necessary to prove the case. But there was a wealth of evidence given to trial counsel during discovery as to the fact that this was a contract killing, just at the end of going to the wrong house, because I think there was probably a difference as to whether it was street versus place or something like that, but they got the wrong street and went to the wrong house because of that. So the world did it with just some random act of crime. But the prosecutor didn't put in the evidence that it was a contract killing? I think the only evidence that was presented that it was a contract killing was the fact that after the crime, the petitioner was able to buy, within a couple of hours of the crime, a Cadillac for $3,000. And I think that was kind of... But I think the prosecutor decided not to try this whole conspiracy outtake of the case because maybe they were missing one piece of evidence or they may have confused the jury as to what was going on, since they went to the wrong house. But I think the key thing here is that we have an organized criminal action by three people that decided that we're looking for the victims, that went with two weapons inside the house. We're not dealing with something that just... The murders in this case were not an act of some kind of random, crazy action of somebody under the influence of drugs. Also, I'd like to ask you about the shackling issue. There's been some discussion about several aspects of it, including what issues were preserved, whether at the guilt phase only or with respect to the penalty phase. And secondly, some factual issues as to when the jurors observed the shackling. And then also your view of whether this is a pre-EPA claim. I know that's a lot of questions in one, but I'd just like you to discuss briefly the shackling issue. As to whether this case is covered by the ADPA, I believe the shackling claim was raised in the very beginning before the act was enacted. So our position at this point in time is that it's not covered by the ADPA. So when you say it was raised, was it raised? Opposing counsel states both as to the guilt phase and the penalty phase. Well, I believe the district court made a finding that the argument was raised only as to the guilt phase. And I think at the time that I read the petitions, I was confused as to whether the claim was being raised as to both phases of trial. I think the district court was wrong in that. I actually went back and looked, and it definitely seems to have always subsumed within the shackling claim that it had an effect during the penalty phase. I could go back through this with you, but the third amendment petition. I believe that what happened in this case, the district court made a finding in the first order that the issue was only raised as to the guilt phase and also made a partial finding that the petition was only restrained during the guilt phase. Right, but the question is, I don't know if I would think that the district court's finding that it was shackled only in the guilt phase was there. I don't think that. But if you look at the third amendment petition at page 19, it says, the trial court's decisions concerning physical restraints violated these principles and had a substantial and injurious effect on the jury's guilt and penalty phase verdicts. So my question is, perhaps the district court did get this wrong. And is there anything to the argument that assumes that he was shackled only during guilt phase and assumes that four jurors saw him shackled during guilt phase. Why wouldn't that, the impressions and all the things that the Supreme Court has warned us about leading from the shackling, roll over into the penalty phase when it's being decided by the same jury? I don't disagree with that position. An argument could be made that because the jury saw some restraints during the guilt phase, that fact could have some effect in the penalty phase. In theory, that argument could be raised. Well, I think it was raised. Isn't it then the government's burden of proof to show under deck that shackling did not affect the jurors' view of the penalty phase beyond a reasonable doubt? I think the burden in some petitions is to show under deck that the use of restraints during the guilt phase had a substantial and injurious effect on the penalty phase verdicts. So the burden is not on us. The burden is on petitioners to show. Because the Brecht standard imposes- The Brecht is over deck? I mean, when would deck come into play? Would it be on direct appeal, as you're saying? I think that's our position. Brecht is the standard for- Deck was a direct appeal case. Yes. And Brecht is the standard for habeas corpus cases that are challenging a state judgment. Okay. So then the question is, given that the jurors, at least four jurors, saw the shackling during the guilt phase and then also decided the penalty phase, whether that shackling had a substantial injurious effect on their determination, or at least one juror's determination, as to whether Cox should live or die. Yeah. The standard is the petitioner has to show that there was a substantial injurious effect as part of the jury's penalty phase verdict, based on seeing this handcuff or seeing the- I think at once during the guilt phase, an ankle chain was used. And I think that as to the issue of prejudice as far as the restraints issue, I think it's very important that this case doesn't involve, like, unlike this thing, the Russian case, it doesn't really involve these heavy chains that were really overly visible to the jury. It doesn't clearly affect the petitioner's ability to sit there in the courtroom. What we have here was mostly the use of a single handcuff that was in his wrist that couldn't be seen by the jury unless the petitioner moved his hand. Also, there was a brace, like a leg brace, used that was inside his pants. Clearly, that was never seen by anyone. Wasn't that later? I mean, didn't the sequence of events go, there was this rumor that he was going gay, so they rarely shackled him up, and that was kind of noticeable. And then over time, they decided that risk was somewhat gone, but they would just keep him shackled only a little bit. I think what happened in this case, after the court decided to use restraints, what was used first in this case was the handcuff. Then at some point during the proceedings, there was another event in which the bailiff told the court that the petitioner was being unruly and something like that, and they decided to use an ankle chain just for the one day. Then the following day, on the record, the court explained that the sheriff's department had come up with this plastic brace or something like that that went inside his pants, and that's what was used the following day. So that's kind of the sequence of events. Then trial counsel and petitioner objected to the use of the leg brace and the court said, all right, we will only use the handcuff. And then at some other point, they may have used the leg brace once again, and that's kind of the sequence of the restraints that were used. And what is your view of the evidence with respect to what the jurors saw and when they saw it? I think just for purposes of the proceedings in the district court, we took the position that even if the jurors saw what they saw as they stated in the declarations, that wasn't prejudicial. So I think what the declarations that were drafted by the Hades game say is that two jurors, or not two jurors, saw the handcuff or thought they saw the handcuff just based on how the petitioner was moving. And one of them supposedly saw the, or actually two of them supposedly saw the ankle chain once, and that was based on the trial record that was only used once. So the one day that supposedly the ankle chain was used, two jurors saw it, and then three of them jurors saw the handcuff. So that's kind of what the factual allegations that were taking us through by the district court, you know. Did the handcuff declarations clearly refer only to the guilt phase, or are they ambiguous? I would say they're ambiguous. There is no specificity. They're ambiguous in all respects. They're ambiguous as to exactly what they saw. I mean, and... Did he have the handcuff on during the penalty phase also? Based on the trial record and based on the findings of the district court, you know, the handcuff or any of these things was not used after the last day of the guilt phase. Okay, so there were no restraints to be seen during the penalty phase. Well, there is no evidence aside from the one declaration by the petitioner's sister, which in itself is very confusing or ambiguous as to what kind of restraint was the one used, because I think the description that she used in her declaration is inconsistent with any kind of restraint ever used in this case. So just taking that clearly, the district court, I mean, we have to assume that they considered every single piece of evidence that was provided to the court, and in finding that the restraints were not used in the penalty phase, rejected that declaration. So I think that on this case, let's say the facts that are taking us through as far as the restraint thing was that four jurors saw the restraints, that the restraints only involved a handcuff, a leg brace, and one financial chain, that these weren't really the type of restraints that would be necessarily a sign that a petitioner is dangerous. I think the key fact here is by the time the jury decided the penalty phase, they already had decided that he was a perpetrator, whether as a shooter or as the second person inside has, of horrible murders, murders that were found to be premeditated in the guilt phase. So clearly, the jury, at the time they decided the penalty phase, they knew that a petitioner is a dangerous individual, and the use of restraints, that there were really kind of minimal restraints, were not something that added anything to what they had to decide in this case. Can you give me the record sites for the juror declarations? I'd like to look at those again. You know, I actually made a photocopy of the juror declarations. For example, the declaration by Ventrilo, Denise, which was Whitfield at the time of trial, I think, that's in the third volume of the E.R., of the Exeter Record, at number 14. Let me find it. What's the name again? The declaration of Ventrilo, Denise, is on, I believe, a page. It's on the third volume of the Exeter Record, tab number 14, and it starts at page 13. There were four of those declarations? There were four? Well, there were several declarations, but only as far as the jurors that started the case, four of them mentioned seeing the restraints, actually seeing the restraints. So there were declarations, but four of them, and this is something that Judge Marshall found, four of them showed that they saw some restraints. And they're all found in volume three at tab 14? Well, actually, let me – no, the only one in volume three is the declaration by Ventrilo, Denise, and I think it's because there was – Well, what is the citation for the other three declarations? If you don't know it now, maybe you could just write it down and send it to the clerk. I think my brief authority has started to – I'm sure it's in the briefs, but this will be helpful. A lot of material on there. I can quickly try to find it here. Why don't you give it after the argument that you give to the clerk? Write it down. I think that my work – for the most part, my argument in my brief and here, too, is that we're assuming it's true that these four jurors saw something, saw a handcuff or saw this one ankle chain for, like, the one day that was used in this case. And even assuming that as true, the petitioner cannot show the requisite prejudice on the bread. And, well, first of all, obviously, as to the guilt phase, since the evidence was overwhelming, and not only overwhelming, but it wasn't disputed, how could it have any effect on the guilt phase? As to the penalty phase, I think that the mere use of a handcuff, that is mostly what was used as convincing by the jury since the lead praise was inside the pants. It conveys the message that he's a dangerous guy. But the jury necessarily found that he was a dangerous guy by finding him guilty. And the basis for restraining him, initially, was, as I recall, his lawyer told the judge that there was some rumor out there that there might be an escape attempt. That's right. I think that his cousin – His own lawyer did that, right? Because he had an ethical duty to tell the court. And then the bailiff came and told the juror that – what was that again? He was acting up? He was acting up, but I think there was some kind of situation with his mother, and he reacted to the bailiff because of something that the bailiff may have said to his mother, or something like that. Something the bailiff said to his mother. That's right. The bailiff – it's not uncommon for some of those bailiffs to say things they shouldn't say. Well, I think we're not disputing in this case. We're going with the California Supreme Court decision that the restraints shouldn't have been used. The issue here is whether the petitioner can show praise on the threat. And our position is that he cannot show praise as to either face of the trial. Are capital defendants routinely shackled? That I don't know. I assume that's just a case-by-case basis. They're case-by-case on whether they're a particularly dangerous killer. I think the defendants are not really shackled based on how bad their crimes are, but, you know, they're probably shackled or restrained based on, you know, whether there's evidence of escape or whether they're misbehaving in the courtroom. So I assume that would be maybe the main reason why a defendant would be restrained in trial. But I think as part of the prejudice – When the judge had this information, were there security, extra security out around the courtroom? I think there were at least two barriers. And I think during some of the hearings, there may have been more than that. Did they have people out in the halls? That I don't know. I think because this case involved – and I think I mentioned this case involved a member of the royal inspectors, and I think that created this more – just a more sensitive environment to the danger to everybody in the courtroom because it wasn't just that he had committed these horrible crimes. It's that he was also a member of the royal inspectors, and they were the ones that may have done something to help him in this case. And I think there was some other evidence that I showed that, like, for example, Burns trying to get a convinced judge to take the blame for him, and he will do something about it. So there was something already going on before this trial that created this fear that there could be escape in this case. But as I said, we're not disputing the California Supreme Court finding that these things weren't necessary. So I think that's kind of a – not really that relevant of an issue in this case. So is William still in prison now? Well, he – I think he was given four terms of 25 years to life, so that's 100 years to life, and he's never going to get out. And Burns? And Burns was also given four terms of first-degree murder. So neither one of – either Burns or Williams is ever going to get out. And I think it's very significant as far as the prejudice in this case, whether it's the restraint issue of the Infectious Disease Commission, that Williams, who was tried as the 89th veteran in this case, nevertheless was given the death penalty. And I think that's, you know, as far as, like, whether there could have been some evidence as to whether Williams was using drugs, and then – I mean, he still got the death penalty, no matter what. The drugs that shooter tried Williams as the 8th veteran? That's right. And the theory that Cox was the killer? That's right. All three cases were tried on the same theory. There was no inconsistency. All three cases were tried on the theory that the prisoner was the shooter. And that's because of the rifle. He was the holder of the rifle, and the rifle was the weapon that killed. He had before and after, and the rifle was what killed. And it was the only murder weapon. And every murder in this case was a direct shot to the head. We're not dealing with, like, some crazy, random shooting. But each victim in this case – the grandmother having the cup of coffee in the kitchen was shot three times in the head. All three shots were in the head. The mother – the daughter of the grandmother was shot three times in the head – well, twice in the head and once in the neck. And the two boys in this case were each shot once in the head. So we're talking a very precise shooting with a military rifle. I mean, I think it's very significant to us to, in respect to the systems issue, that Williams had his own firearm in this case. He didn't need to use the rifle to shoot anybody. And if he was going to suddenly go crazy and start shooting people, he would have used his own handgun. He wouldn't have just said, all right, Petitioner, give me your rifle and I'm going to use yours. That would clearly show some kind of intentional or premeditated conduct as opposed to just some – and I think that kind of goes off to why evidence that Williams may have been using crack – and there was no evidence that Petitioner ever used any crack, but evidence that Williams used crack wasn't really that significant. Or the plan, or evidence that the plan would have worked. But the plan also shows that this was a premeditated murder. It shows that they weren't looking for the rapists. They weren't both of them into the house of fire. All right, but Petitioner's already found that. So I'm just thinking, you know, what did they plan, that Cox would do it or that Williams would do it? In the way to the house, twice, and while Petitioner was still inside the van, twice, there were things made by the people behind the two women that were driving, so they didn't see exactly who said it. But I think one of the times it was Williams that said that we're going to go and shoot everybody. We're going to go and kill everybody. Those two statements were made in the way to the house. Once Petitioner and Williams left the van and started walking to the house, one of the two women in the van asked Burns, what's going on? What are they doing? And he said something like, they're going to go and shoot it up or something like that. So he made some kind of statement. But while Petitioner was inside the van, Williams, the two that actually committed the crimes, they said we're going to go, somebody said we're going to go and kill everybody in the house. And clearly, in this case, the actions speak louder than any words. I mean, they went without any kind of provocation and shot a whole family. This wasn't something that just saw that something happened inside, while they were inside the house and they started shooting people. Each of the victims in this case was shot before they even knew what was going on. And a few of them were sleeping at the time they were shot. So clearly, in this case, there was no specific event that somehow changed the plans that they had. Each victim was killed according to the plan. And that's what, I mean, nothing that, this is one of those cases that nothing trial counsel could have done would have made a difference. And I think he made this reasonable decision that whoever the jury finds to be the shooter in this case has no chance to get the death penalty. Because this is one of those crimes that couldn't be justified somehow or mitigated by anything. Just because he was mistreated by his mother in his early childhood, that's not going to change what he did in this case. It doesn't minimize any moral culpability for killing women and children for money. So he can buy himself a kind of life. That's the evidence that the jury was looking at when they decided that the shooter should get the death penalty. Let me, just one last question I have for you. The district court determined in the claim of ineffective assistance of counsel at the felony stage that counsel was not deficient in any respect and that there was no prejudice. That's right. That she decided both those things. She decided both, and I think there may have been some ambiguity or something that she corrected in a subsequent order in response to a petition of motion to reconsider. She said, no, I denied the claim on both crimes, after both crimes of trickling, the performance and the prejudice. Not just one, not just the performance. It's just that the trial court, well, Judge Marshall, made very specific findings as to the performance, I think. But she found repeatedly that he wasn't, I mean, what specific thing did she find was sufficient? I mean, I read her opinion. I didn't see anything. Well, she didn't find anything. Yeah, she found everything reasonable. Everything was reasonable, but even if somehow some of the evidence provided by, during the habeas proceedings should have been presented, even if that should have been investigated and presented, still there was no prejudice. That was the finding of Judge Marshall in this case. I believe unless the court has any other questions. Actually, I would, you know, if you don't mind, I just have one last point I wanted to make. Actually, two last points. As far as the habeas counsel relied on Dr. Maloney's declaration that was provided, you know, in the habeas proceedings, I think the pertinent point here is that at the time that trial counsel was making his decisions for the penalty phase, Maloney told trial counsel something very different than what he said in those declarations. And also, I think it's very significant that at the evidential hearing, Dr. Maloney testified that he didn't request any documents. He didn't do anything else in this case. He didn't suggest anything else because he could not render any opinions in this case unless the petitioner cooperated with an interview and an evaluation. So I think that's the key point as far as Dr. Maloney is concerned and as far as whether counsel should have investigated more or presented any evidence of any mental impairment, which there was none anyway at that time. The important point is that their own expert told him there's nothing I can do in this case, and I'm not going to do anything else because he refuses to be evaluated. And I think he made a, you know, counsel made a reasonable determination that, first of all, that there is nothing there as far as mental impairment, and second, their own expert said there's nothing I can do. So counsel cannot possibly be blamed for following what their own expert told them, especially when counsel had no notice of any mental impairment in this case anyway. So they just decided to retain a mental health expert just, you know, just to go the extra step, but not because there were a notice of anything. And my last point is I think there was some mention that opposing counsel as to the vacancy intent to kill, and I think it's very clear in cases like this one where the underlying crimes were tried as committed a murder as opposed to a felony murder, that the specific intent to kill is not a requirement for data and a better, either as to the underlying crimes or the special circumstances, but prosecution has to prove as far as the special circumstance was the intent to aid in the killing. And I think in this case it's pretty clear that even if the petitioner wasn't sure if he intended to aid in the killing because he brought in the weapon to the house and he brought it out too, aside from everything else at all this time. And I think on that last point I would like to submit on. Thank you. Thank you. Recognizing that I am out of time, I'm going to limit my rebuttal to some very quick points. Judge Wardlaw asked if capital defendants are routinely shackled in California. No, they are not. But more importantly, in this case, neither Burns nor Williams was shackled at trial. They had the same gang affiliations. There was even more reason to, if you're looking at the crime which is incorrect, to shackle one of those two defendants. And in the record before this court are the declarations of counsel for Mr. Burns and counsel for Mr. Williams at trial explaining that. The level of security in this case included a handheld wand, a metal detector outside before you enter the courtroom, and then bailiffs and uniformed security inside the courtroom. So there was plenty of security. I also want to correct what I believe is a mistake on counsel's part with respect to the law. Yes, the standard is was there a substantial and injurious, did the error have a substantial and injurious influence or effect on the jury's verdict. But the burden is not on petitioner to show that. This court's case is clear about that, and O'Neill is also clear that the risk of loss, so to speak, falls on the state. So if this court has any doubt about which way this issue should go on the question of prejudice, the tie goes to petitioner. What case do you have on that that's the rule? I believe it's in O'Neill itself from the U.S. Supreme Court, and I really can't pronounce the last name of that case. Let me find it because we cited it in our last supplemental brief. Okay, it's O'Neill, and it's at 513 U.S. 432. And this court picked up that language in the Shacklin case, actually, and I think it was Rodin v. Roland, and found that the error there was an equipoise, and they found in favor of petitioner. And Rodin actually might even have been a post-AEDPA case. I also want to give the court the citations to the jury declarations about the Shacklin. Why don't you just write those down? Okay. The other things I want to hit on are a few very quick points about the penalty phase. First of all, one of the reasons that this was not a strategic decision is counsel said, with respect to the abuse evidence, they put on what they had, they would have wanted more, and they would have put on more. With respect to the issue of prejudice from the penalty phase deficiencies, I neglected to mention, and want to mention it now, that two really important aspects of prejudice are that the rosy picture that was painted of Mr. Cox's upbringing, as the court now knows from the documents we have put in front of the court, was false. And the other point is that the prosecution took the paltry little amount of mitigation that was put on, and turned it against Mr. Cox. The prosecutor argued that Mr. Cox had every advantage in life. He had love and discipline from his caretakers. He had monetary advantage, and look what he did. Look what happened. He did the same thing with respect to the school teachers. He argued, and this is all cited in our brief, he argued that Mr. Cox had the intellectual ability, no impediments to using that intellectual ability to succeed in high school, and he essentially said that the women who came in and testified who had taken care of Mr. Cox, as well as the teachers, were also Mr. Cox's victims. He totally turned the evidence against him. With respect to whether there was any evidence concerning Williams' use of crack, and Judge Wardlaw zeroed in on this, had Stanley Cheatham been interviewed and testified, he would have testified that he, Cheatham, Ida Moore, and Williams were smoking crack on the night before the offense. And then he, Cheatham, fell into a crack coma. There's also evidence in the record. I'm not going to find the site, but in Lisa Brown's testimony during the guilt phase, counsel elicits from her that they were up all night partying the night before, and that was something the counsel never followed up on. I understood crying was 8 a.m. Yes, yes, and Brown has them being up all night before partying. On the question of- Just to follow that one up, now, Cook said that he couldn't get a hold of Moore or Brown because they were in the Witness Protection Program and were unavailable. They were not in the Witness Protection Program at all, and I actually don't know where that came from. The other issue is there was no evidence of the contract nature of the killing in Mr. Cox's case, was it or wasn't it, but the evidence that was before the jury was Ida Moore's testimony, and it appears in volume 23 of the excerpt of record, tab 39, pages 143 to 144, where she says that Williams said that he was going to collect the debt from a woman, and that was the testimony. With respect to Respondent's point about the fact that Williams had a handgun, obviously there are pieces of evidence that could be argued either way in this case, but that's a jury issue, and what we do know is that the jury who heard that evidence and all the other evidence at the penalty phase wrestled with who was the aider and abettor, so it didn't seem to have affected their assessment of the descriptions that were given by Ivan and Neal, and the fact that Ivan and Neal testified that after Neal Alexander jumped on Williams' back, there were no further shots to be heard coming out of the house, that that was the end of the shooting. Both people in the house testified to that. Did his hook testify that Cox's family members said he was the hit person for the gang? That was one of – it actually – no, I believe that the evidence was that there was a rumor that Mr. Cox had committed 12 murders or something like that, and that, yes, of course, in a case like this we're going to be dealing with rumors, but that's the purpose of discovery. It was nothing that was turned over to them that suggested there was any truth to that, that the prosecutor had any information that anything like that, not even 12, but just let alone a prior violent offense other than the robberies that sent him to CYA, were accurate. And finally, with respect to Dr. Maloney, I think the court's cases on Caro and Wallace and there are two others, that whatever trial counsel's duty is with respect to a mental health professional at the guilt phase, at the penalty phase of trial, the burden is on trial counsel to provide the expert with what he needs to be of assistance in the penalty phase. And counsel never provided Dr. Maloney with school records, never provided him with any of the results of their interviews or any information about Mr. Cox. And it is not true that the expert and trial counsel agreed they could do nothing with Dr. Maloney once Mr. Cox had declined to be interviewed. And in fact, Dr. Maloney said and counsel Rothstein also said that she knew and he knew that he could testify and had testified in cases where the client was not accessible for an interview. And frankly, the state does that all the time when they put on a mental health professional to opine something about the defendant. They routinely do not have access, at least not in state court, to the client. They just do it so hypothetically. And if the court has no further questions, I thank you for giving me the extra time. All right. We're going to take a brief recess.
judges: Pregerson, Graber, Wardlaw